IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VINCENT CHAPOLINI, | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION NO. 22-284 |
| | : | |
| v. | : | |
| | : | |
| CITY OF PHILADELPHIA; | : | |
| PHILADELPHIA DEPARTMENT OF | : | |
| PRISONS COMMISSIONER BLANCHE | : | |
| CARNEY; CORIZON HEALTH | : | |
| PERSONNEL; R.N. KEIADY; and | : | |
| DOCTOR STEVEN WILBRAHAM, | : | |
| individually and in their official capacities, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

Smith, J.                                                              March 17, 2022

The *pro se* plaintiff, who is currently a pretrial detainee at a Philadelphia correctional

institution, has sought leave to proceed *in forma pauperis* in this civil rights action under 42 U.S.C.

§ 1983 in which he asserts constitutional claims against a nurse and doctor at a correctional

institution, the City of Philadelphia, and the commissioner of the Philadelphia Prison System. The

plaintiff asserts claims against all individual defendants in their official and individual capacities.

The plaintiff alleges that the nurse and doctor at the correctional facility were deliberately

indifferent to his serious medical needs when they failed to properly treat an issue he was having

with his "shattered heel." He also alleges that the doctor delayed in the plaintiff getting surgery on

his heel and also lost a CD containing images of his heel that was supposed to go to the plaintiff's

surgeon prior to the surgery. Although the plaintiff ultimately had surgery on his heel, he claims

that the surgeon essentially missed fixing certain issues with his foot because he did not have

access to the CD with the images prior to the surgery.

In addition to these deliberate indifference claims, the plaintiff asserts that the City of Philadelphia and the commissioner of the prison system violated his constitutional rights due to the conditions at two of Philadelphia's correctional institutions. More specifically, he complains about the conditions at the correctional institutions caused by the COVID-19 pandemic, which included, *inter alia*, various lockdowns and other limitations on his freedom of movement and access to the law library. He also contends that measures taken at the prison caused him to contract COVID-19, and he now has long-term issues resulting from contracting the coronavirus.  He further asserts that the conditions at his current place of confinement are unsanitary.

As discussed below, the court will grant the plaintiff leave to proceed *in forma pauperis*. As for the complaint, the court has screened the complaint pursuant to 28 U.S.C. § 1915(e)(2) and will (1) dismiss with prejudice any official capacity claims against the nurse and doctor, (2) dismiss without prejudice (a) claims against the city and the commissioner, (b) any claim relating to the failure to protect against COVID-19, and (c) a potential denial of medical care claim as it relates to COVID-19, and (3) allow his individual capacity claims against the nurse and doctor to proceed. The court will allow the plaintiff the opportunity to amend claims that the court dismisses without prejudice or proceed only on his claims against the nurse and doctor that have passed statutory screening.

## I.   ALLEGATIONS AND PROCEDURAL HISTORY

On January 20, 2022, the clerk of court docketed the following documents submitted by the *pro se* plaintiff, Vincent Chapolini ("Chapolini"): (1) an application for leave to proceed *in forma pauperis* ("IFP Application"); (2) a complaint; (3) a prisoner trust fund account statement; and (4) a motion to appoint counsel. *See* Doc. Nos. 1–4. In the complaint, which is largely handwritten on lined paper, Chapolini alleges that he is a pretrial detainee currently housed at the

Philadelphia Industrial Correctional Center ("PICC").[1] *See* Compl. at ECF pp. 2, 11, 13, Doc. No. 2; *see also* Notice of Change of Address, Doc. No. 6. Chapolini asserts claims under 42 U.S.C. § 1983 against the defendants, R.N. Keiady ("Nurse Keiady") and Dr. Steven Wilbraham, for events that occurred during his detention at the Curran-Fromhold Correctional Facility ("CFCF").[2] *See* Compl. at ECF pp. 3–8. He also asserts claims against the City of Philadelphia (the "City") and the Philadelphia Department of Prisons' Commissioner, Blanche Carney ("Commissioner Carney") for alleged unconstitutional prison conditions at CFCF and PICC. Chapolini sues all defendants in their individual and official capacities. *See id.* at ECF p. 1.

As indicated above, Chapolini alleges facts which appear to fall into two broad categories: (1) deliberate indifference to his serious medical need, a "shattered heel," *see id.* at ECF pp. 3–8, Doc. No. 2; and (2) unconstitutional conditions of confinement at CFCF and PICC, *see id.* at ECF pp. 8–14.

### A.   Allegations of Deliberate Indifference Against Nurse Keiady and Dr. Wilbraham

On January 12, 2020, Chapolini was transported to the CFCF intake/quarantine unit, already suffering from a "shattered heel." *Id.* at ECF p. 3. On January 18, 2020, he was rehoused at the chronic care unit due to his "severe injury and confinement to a wheelchair." *Id.* Two days later, he woke at 12:45 a.m. to find that blood had soaked through the soft cast and bandages on his foot. *See id.* Chapolini immediately contacted his block officer, who arrived and then transported Chapolini to the CFCF medical department. *See id.* at ECF pp. 3–4.

---

[1] In addition to the handwritten allegations, Chapolini attaches numerous exhibits to the complaint, which include inmate grievance forms, an August 19, 2020 letter in response to Chapolini's grievances, Chapolini's medical records, and two news articles about Philadelphia prisons during the time of the COVID-19 global pandemic. *See* Compl. at ECF pp. 20–52.

[2] Chapolini was transferred from CFCF to PICC on December 4, 2021. *See* Compl. at ECF p. 13.

While at the medical department, Nurse Keiady assessed the issue with Chapolini's foot and told him that "nothing was wrong and to return to his housing unit." *Id.* at ECF p. 4. Despite verbally expressing the significant pain he was experiencing at that time, Chapolini did as he was told and returned to his housing unit. *See id.*

After being returned to his housing unit, Chapolini could not fall asleep due to the "extreme pain he was enduring." *Id.* He then notified another block officer, who was already aware of the issue with Chapolini's foot, and this other officer sent Chapolini back to the medical department after seeing his "blood[-]soiled soft cast and bandages." *See id.* On this visit to the medical department, Dr. Wilbraham assessed the issue with Chapolini's foot. *See id.* Dr. Wilbraham removed the soiled bandages but left the soiled soft cast on Chapolini's shattered heel. *See id.* Dr. Wilbraham next wrapped the soiled soft cast with a fresh Ace bandage, and he ordered a lab technician to take bloodwork from Chapolini to "check for any systemic infections." *Id.* at ECF pp. 4–5. Dr. Wilbraham then instructed Chapolini to return to his housing unit, which Chapolini did, despite complaining about his "extreme pain." *Id.* at ECF p. 5.

On January 21, 2020, Dr. Wilbraham received Chapolini's lab test results, and he called Chapolini to the medical department to review those results with him. *See id.* Dr. Wilbraham indicated to Chapolini that the lab results "revealed that [Chapolini's] untreated injury caused him to have a severe blood infection." *Id.* Chapolini was then taken by ambulance to the Jefferson Aria Torresdale Hospital's emergency room for emergency treatment. *See id.* at ECF p. 5 and Ex. B.

While at the emergency room, medical staff removed the top layer of skin on Chapolini's heel due to it being "covered with multiple large pus [sic] and blood[-]filled blister's [sic]." *Id.* Chapolini was admitted to the hospital, and medical staff conducted additional lab work on him. *See id.* The lab work revealed that Chapolini had a "very severe infection," and the medical staff

4

allegedly told him that "if he would [have] went a few more days [without treatment,] he could've lost his entire foot or even succumbed [sic]." *Id.* at ECF p. 6. To address the infection, Chapolini received intravenous antibiotics. *Id.*

The following day, Chapolini was discharged from the hospital and returned to CFCF. *See id.* He was also prescribed medication "to combat and cure his infection." *See id.*

From January 23, 2020, until March 2, 2020, Chapolini submitted multiple sick call requests or emergency grievances relating to his foot. *See id.* At some point seemingly during this period, Chapolini was sent to the Rothman Institute to see a bone surgeon, Dr. Daniel Fuchs. *See id.* Dr. Fuchs ordered imaging of Chapolini's foot. *See id.* at ECF p. 7. After the images were taken and placed on a CD, Chapolini requested Dr. Wilbraham to send the images to Dr. Fuchs. *See id.*

Dr. Wilbraham apparently did not send the images to Dr. Fuchs because he lost the CD. *See id.* Dr. Fuchs apparently performed the surgery despite not having the CD with the images. *See id.* Chapolini believes that Dr. Fuchs performed surgery on his foot, without first having the images to review, because "a continued delay in the surgery . . . would've resulted in total lost [sic] of function of [his] foot or even amputation of his foot." *Id.* A day after the surgery, Chapolini was discharged from the hospital. *See id.* at ECF p. 8.

Chapolini alleges that Dr. Wilbraham's failure to provide the images to Dr. Fuchs has permanently disabled him because Dr. Fuchs had "to rush into surgery virtually blind and not knowing what to expect." *Id.* Chapolini believes that he now has less than 50% functionality in his right foot due to Nurse Keiady and Dr. Wilbraham's inaction in treating him. *See id.* He also claims that multiple tendons and ligaments went unrepaired. *See id.* He goes on to assert that Dr. Wilbraham knowingly delayed his surgery, which caused "permanent scarring from the infection." *Id.* at ECF pp. 8, 16.

**B.**      <u>Allegations Regarding the Conditions of Chapolini's Confinement</u>

In response to the onset of the COVID-19 pandemic in the United States, Commissioner Carney "instructed all of her subordinates to impose daily (23 hr. – 40 mins) lockdown(s)" on March 6, 2020. *Id.* at ECF p. 7. Due to the lockdowns, Chapolini lost access to the law library, in-person visitation, adequate exercise out of his cell, laundry service, and cleaning supplies. *See id.* at ECF pp. 8–9. He complains that he was allowed out of his cell for only 20 minutes a day which forced him to have to choose to use that time to take a shower or to call his loved ones. *See id.* at ECF p. 8. These conditions apparently continued for months. *See id.* at ECF pp. 8, 9, 11. In addition, for 26 days in April 2020, he could not access items from the commissary because an individual in his unit had contracted COVID-19.[3] *See id.* at ECF pp. 8–9.

On May 4, 2020, Commissioner Carney "intentionally instructed" CFCF correctional officers who would have worked overtime, "to go home." *Id.* at ECF p. 9. Chapolini believes that if she had permitted the correctional officers to work overtime, it would have allowed him and his peers to receive exercise time, take showers, or use the phone. *See id.*

Between mid-March 2020 and May 20, 2020, Chapolini had multiple cellmates who came from either CFCF's intake housing unit or another general population unit which had not been properly quarantined. *See id.* at ECF p. 10. Chapolini contends that this put him at daily risk of contracting COVID-19. *See id.* Although he complained to CFCF staff about this issue, "nothing changed." *Id.*

---

[3] Chapolini asserts that he could not access items from the commissary because Commissioner Carney "allowed" the company whom the City had contracted with to provide multiple commissary items to the Philadelphia jails to not accept commissary order forms from him or other incarcerated individuals housed in his unit. *See* Compl. at ECF pp. 8–9. He claims that this caused him to be "essentially punished" and "unable to get soap, laundry detergent, and food." *Id.* at ECF p. 9. Without receiving these commissary items or "enough essential(s) from his correctional officers," Chapolini suffered "great stress, hardship, and anxiety . . . on top of his pre-existing mental health issue(s) and physical recovery." *Id.*

Chapolini and his cellmate, who had worked in an area where there were individuals who tested positive for COVID-19, were tested for COVID-19 on May 21, 2020, and tested negative. *See id.* Chapolini, along with 25 other inmates from his housing unit, was also tested for COVID-19 on July 7, 2020. *See id.* On July 9–10, 2020, Chapolini and the other inmates on his unit tested positive for COVID-19, and they underwent a 14-day quarantine after being moved to a different facility.[4] *See id.* Chapolini notes that he and a majority of these other individuals had, prior to their positive test results, complained to medical and correctional staff at CFCF because they were experiencing "the <u>absolute</u> <u>worst</u> cold symptoms" any of them ever had. *Id.* at ECF pp. 10–11. These complaints "went virtually unanswered or were blatantly ignored." *Id.* at ECF p. 11.

Since contracting the coronavirus, Chapolini asserts that he is presently a COVID-19 "long[-]hauler." *Id.* He requires two inhalers and other medications "to maintain a healthy status." *Id.* He also alleges that he has become a diabetic at the age of 36 due to the lack of "out-of-cell time" for exercise. *Id.*

At some point, conditions at CFCF improved, at least somewhat. Chapolini asserts that these "meager[] improve[ments]" at his housing unit occurred after Commissioner Carney and the City were "ordered . . . to improve the unsanitary and unsafe conditions" at CFCF in accordance with *Remick v. City of Philadelphia*, Civ. A. No. 20-1959 (E.D. Pa.). *Id.* at ECF p. 12. Despite these improvements, Chapolini alleges that he was still unable to access the law library prior to his preliminary hearing, which "irreparably damaged" his defense of his criminal charges and caused him "extreme stress and anxiety."[5] *Id.* He claims that there were many days where the mental

---

[4] Chapolini appears to assert that he contracted COVID-19 because an individual was returned to his housing unit after being taken to a hospital days earlier due to a chronic condition making the individual "extremely vulnerable to contracting the coronavirus." Compl. at ECF p. 10. This individual was allegedly not "quarantined properly upon his return to the facility" on July 7, 2020. *Id.*

[5] Chapolini is charged with a string of burglaries and other crimes in 14 separate cases currently pending in the Court of Common Pleas of Philadelphia County. *See Commonwealth v. Chapolini*, No. CP-51-CR-1357-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001357-

health staff would come to his cell door and offer him medication to cope with the harsh conditions

he was enduring. *See id.*

Between November 18, 2020, and October 2021, Chapolini "experienced countless

lockdown(s)[] due to staff shortages." *Id.* at ECF pp. 12–13. He also "endured countless extremely

unnecessary 14[-]day quarantine(s)" which prevented him and other peers from going to court.[6]

*See id.* at ECF p. 13. On December 4, 2021, Chapolini was "abruptly transferred" from CFCF to

PICC, which Chapolini believes "house[s] most of the [Philadelphia Prison System's] more violent

---

2021&dnh=hlXi84%2B3bR2O1xo36T%2BhIA%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1344-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001344-2021&dnh=fR6kMFHXKc0ciEIBsrTxLA%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1343-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001343-2021&dnh=QbbW4aw9cJm8gC9lzzNrWQ%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1342-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001342-2021&dnh=RwuwE7sunmjPB%2BGsBbkZLw%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1341-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001341-2021&dnh=yApf%2B3K6q7dYexcedrBvKw%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1338-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001338-2021&dnh=tDB99B9T1IfA2wHYgezyOw%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1337-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001337-2021&dnh=NyLfWUfOqu1%2FZeN8c2hslA%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1336-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001336-2021&dnh=jDv2Y4gcrtBEtsBzKN%2Bhtw%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1335-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001335-2021&dnh=rjYKkcOWu2r9uc9eERVCzg%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1334-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001334-2021&dnh=y2V6vO4FP2TBnmgkUU7pLQ%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1333-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001333-2021&dnh=iSlMae12e9TuhJ9M1nPe1g%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1331-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001331-2021&dnh=y6vYI16OXklBZki5KTNEkg%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1330-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001330-2021&dnh=UzlyuFzKS9VIv5k70%2FJftA%3D%3D; *Commonwealth v. Chapolini*, No. CP-51-CR-1329-2021 (Philadelphia Ct. Com. Pl.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=CP-51-CR-0001329-2021&dnh=1n9ucf46ogDYjz63pUFQ7Q%3D%3D. The Philadelphia Defender's Association represents Chapolini in these cases.

[6] Chapolini asserts that these quarantines were caused by a Commissioner Carney directive to "house newly received inmate(s) (and/or) re-infected individual(s) awaiting to be cleared, to be moved onto an available cell (living quarter(s)), on a vaccinated unit." Compl. at ECF p. 13.

and unvaccinated individuals."[7] *Id.* While at PICC, Chapolini observed "countless mice and roaches (scampering around), [and] wild undomesticated city birds flying about [and] dropping their fecal matter around the unit." *Id.* At PICC, Chapolini has been subjected to excessive lockdowns and that it was "hard to breath [sic] . . . due to smoky conditions." *Id.* at ECF p. 14. He also still cannot access the law library. *See id.* at ECF p. 13.

### C.   Causes of Action and Requests for Relief

The court has interpreted Chapolini's allegations as asserting two claims for relief under section 1983: First, he claims that Nurse Keiady and Dr. Wilbraham were deliberately indifferent to his serious medical needs. *See id.* at ECF pp. 15–16. Second, he claims that that the City and Commissioner Carney subjected him to unconstitutional conditions of confinement. *See id.* at ECF p. 16. Chapolini also appears to raise claims associated with his COVID-19 diagnosis, which appear to be asserted against Commissioner Carney. *See id.* at ECF pp. 16, 17.

Chapolini seeks $10,000 against each defendant in compensatory damages and $150,000 in punitive damages. *See id.* at ECF p. 18. He also seeks declaratory and injunctive relief. *See id.*

### II.   DISCUSSION

### A.   The IFP Application

Regarding applications to proceed *in forma pauperis,*

> any court of the United States may authorize the commencement, prosecution or defense of any suit, action or proceeding, civil or criminal, or appeal therein, without prepayment of fees or security therefor, by a person who submits an affidavit that includes a statement of all assets such prisoner possesses that the person is unable to pay such fees or give security therefor.

28 U.S.C. § 1915(a)(1). This statute

> "is designed to ensure that indigent litigants have meaningful access to the federal courts." *Neitzke v. Williams,* 490 U.S. 319, 324, 109 S.Ct. 1827, 104 L.Ed.2d 338

---

[7] Chapolini believes that he was transferred so he could participate in a prescribed drug/alcohol program to which he had no issue with participating. *See* Compl. at ECF p. 14.

(1989). Specifically, Congress enacted the statute to ensure that administrative court costs and filing fees, both of which must be paid by everyone else who files a lawsuit, would not prevent indigent persons from pursuing meaningful litigation. *Deutsch*[ *v. United States*, 67 F.3d 1080, 1084 (3d Cir. 1995)]. Toward this end, § 1915(a) allows a litigant to commence a civil or criminal action in federal court in [sic] *forma pauperis* by filing in good faith an affidavit stating, among other things, that he is unable to pay the costs of the lawsuit. *Neitzke,* 490 U.S. at 324, 109 S.Ct. 1827.

*Douris v. Middletown Twp.*, 293 F. App'x 130, 131–32 (3d Cir. 2008) (per curiam) (footnote omitted).

The litigant seeking to proceed *in forma pauperis* must establish that the litigant is unable to pay the costs of suit. *See Walker v. People Express Airlines, Inc.*, 886 F.2d 598, 601 (3d Cir. 1989) ("Section 1915 provides that, in order for a court to grant *in forma pauperis* status, the litigant seeking such status must establish that he is unable to pay the costs of his suit."). "In this Circuit, leave to proceed *in forma pauperis* is based on a showing of indigence. [The court must] review the affiant's financial statement, and, if convinced that he or she is unable to pay the court costs and filing fees, the court will grant leave to proceed *in forma pauperis*." *Deutsch*, 67 F.3d at 1084 n.5 (internal citations omitted).

Here, after reviewing the IFP Application, it appears that Chapolini is unable to prepay the fees to commence this civil action. Therefore, the court will grant him leave to proceed *in forma pauperis*.[8]

**B.** **Standard of Review – Screening of Complaint Under 28 U.S.C. § 1915**

Because the court has granted Chapolini leave to proceed *in forma pauperis*, the court must engage in the second part of the two-part analysis and examine whether the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or asserts a claim against a

---

[8] As Chapolini is a prisoner, he must fully pay the filing fee in installments due to the Prison Litigation Reform Act. *See* 28 U.S.C. § 1915(b).

defendant immune from monetary relief. *See* 28 U.S.C. § 1915(e)(2)(B)(i)–(iii) (providing that "[n]otwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that-- . . . **(B)** the action or appeal—**(i)** is frivolous or malicious; **(ii)** fails to state a claim on which relief may be granted; or **(iii)** seeks monetary relief against a defendant who is immune from such relief"). A complaint is frivolous under section 1915(e)(2)(B)(i) if it "lacks an arguable basis either in law or fact," *Neitzke*, 490 U.S. at 325, and is legally baseless if it is "based on an indisputably meritless legal theory." *Deutsch*, 67 F.3d at 1085. As for whether a complaint is malicious,

> [a] court that considers whether an action is malicious must, in accordance with the definition of the term "malicious," engage in a subjective inquiry into the litigant's motivations at the time of the filing of the lawsuit to determine whether the action is an attempt to vex, injure or harass the defendant.

*Id.* at 1086. "[A] district court may dismiss a complaint as malicious if it is plainly abusive of the judicial process or merely repeats pending or previously litigated claims." *Brodzki v. CBS Sports*, Civ. No. 11-841, 2012 WL 125281, at *1 (D. Del. Jan. 13, 2012).

Concerning the analysis under section 1915(e)(2)(B)(ii), the standard for dismissing a complaint for failure to state a claim pursuant to this subsection is identical to the legal standard used when ruling on motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999) (applying Rule 12(b)(6) standard to dismissal for failure to state claim under section 1915(e)(2)(B)). Thus, to survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 556 (citation omitted).

In addressing whether a *pro se* plaintiff's complaint fails to state a claim, the court must liberally construe the allegations set forth in the complaint. *See Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) ("At this early stage of the litigation, we accept the facts alleged [in the *pro se*] complaint as true, draw all reasonable inferences in [the *pro se* plaintiff's] favor, and ask only whether that complaint, liberally construed, . . . contains facts sufficient to state a plausible . . . claim." (citation, internal quotation marks, and all original alterations omitted)); *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) ("We construe Vogt's pro se filings liberally. This means we remain flexible, especially 'when dealing with imprisoned pro se litigants' like Vogt." (internal citations omitted) (quoting *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244–45 (3d Cir. 2013))); *Higgs v. Att'y Gen.*, 655 F.3d 333, 339–40 (3d Cir. 2011) (explaining that "when presented with a *pro se* litigant, we have a special obligation to construe his complaint liberally" (citation and internal quotation marks omitted)). Yet, conclusory allegations will not suffice. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Twombly*, 550 U.S. at 555)).

Additionally, when construing a *pro se* plaintiff's complaint, the court will "'apply the relevant legal principle even when the complaint has failed to name it.'" *Vogt*, 8 F.4th at 185 (quoting *Mala*, 704 F.3d at 244). However, *pro se* litigants "'cannot flout procedural rules—they must abide by the same rules that apply to all other litigants.'" *Id.* (quoting *Mala*, 704 F.3d at 245).

## C.   Analysis

Chapolini appears to be seeking relief in this case under 42 U.S.C. § 1983. This statute provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983. When attempting to establish a claim under section 1983, a plaintiff must allege and prove that a "person" deprived the plaintiff of a constitutional right while acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 49 (1988) ("To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."). In addition, the plaintiff must allege that each defendant was personally involved in the alleged constitutional violation and assert how each defendant was involved in the events and occurrence giving rise to the claims. *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).

### 1.    Claims Against Nurse Keiady and Dr. Wilbraham

Chapolini alleges that Nurse Keiady was deliberately indifferent to his serious medical needs by "completely denying [him] emergency medical treatment for his severely infected/shattered heel." Compl. at ECF p. 15. He also alleges that Dr. Wilbraham was deliberately indifferent to his serious medical needs for "delaying surgery for two months," which caused his "shattered heel to become extremely infected," and for failing to provide copies of the imaging to Dr. Fuchs in advance of Chapolini's surgery, which caused "partial/permanent disability." *Id.* at ECF p. 16. Chapolini asserts these claims against Nurse Keiady and Dr. Wilbraham in their individual and official capacities. *See id.* at ECF p. 1.

To state a constitutional claim based on the failure to provide medical treatment, a prisoner must allege facts indicating that prison officials were deliberately indifferent to his serious medical

needs.[9] *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). A prison official is not deliberately indifferent "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "A medical need is serious, . . . if it is one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." *Monmouth Cty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987) (internal quotation marks omitted). A plaintiff properly alleges deliberate indifference "where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need exists where "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). Allegations of medical malpractice and mere disagreement regarding proper medical treatment are insufficient to establish a constitutional violation. *Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).

---

[9] The Eighth Amendment governs claims brought by convicted inmates challenging their conditions of confinement, while the Due Process Clause of the Fourteenth Amendment governs claims brought by pretrial detainees. *See Hubbard v. Taylor (Hubbard I)*, 399 F.3d 150, 158 n.13, 166 (3d Cir. 2005). Here, Chapolini states that he was a pretrial detainee during his incarceration at CFCF and PICC; therefore, the court will analyze his allegations under the Fourteenth Amendment. Nonetheless, the standard under the Eighth Amendment and Fourteenth Amendment for claims related to a prisoner's medical needs is essentially the same for purposes of the analysis. *See Miller v. Steele-Smith*, 713 F. App'x 74, 76 n.1 (3d Cir. 2017) ("Because a Fourteenth Amendment claim for inadequate medical care is analyzed pursuant to the same standard applied to an Eighth Amendment claim, we will analyze [the pretrial detainee plaintiff's] claim in accordance with that familiar framework." (citation omitted)); *Moore v. Luffey*, 767 F. App'x 335, 340 n.2 (3d Cir. 2019) (declining to address whether new standard applies to claims raised by pretrial detainees based on issues related to medical care).

After reviewing the allegations in the complaint, Chapolini has stated plausible section 1983 claims against Nurse Keiady and Dr. Wilbraham in their individual capacities. Therefore, the court will allow these individual capacity claims to proceed to service of process at this time.

As for Chapolini's official capacity claims against Nurse Keiady and Dr. Wilbraham, he may not maintain these claims. It appears that Chapolini asserts that Nurse Keiady and Dr. Wilbraham are Corizon Health employees who provide medical services to individuals incarcerated at CFCF. *See* Compl. at ECF pp. 1, 2–3. Because Nurse Keiady and Dr. Wilbraham are Corizon employees, Chapolini's official capacity claims are not cognizable because Corizon is a private entity. *See Owens v. Connections Cmty. Support Programs, Inc.*, 840 F. Supp. 2d 791, 796 (D. Del. 2012) ("Generally, a suit against a[] public officer in his or her official capacity is used to compel that officer to take some official action. The concept, however, is inapplicable to suits against private parties where the entity is also susceptible to suit." (internal citation omitted)). Even if official capacity suits against individuals who work for private companies are cognizable, the suit would, in effect, be one against the company for whom that individual works. *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." (internal citation omitted)); *Owens*, 840 F. Supp. 2d at 796 ("Indeed, a suit naming an individual in his official capacity is considered a suit against the employer." (citations omitted)). Since Chapolini has not attempted to name Corizon Health as a defendant, the official capacity claims against its employees, Nurse Keiady and Dr. Wilbraham, are dismissed. *See Burk v. West*, Civ. A. No. 21-CV-4968, 2021 WL 5758945, at *2 (E.D. Pa. Nov. 24, 2021) ("Since [the plaintiff] has not attempted to name th[e private entity employing the individual defendants sued in their

official capacities], the official capacity claims against [the private entity's employees] are dismissed.").

### 2.    Official Capacity Claims Against Commissioner Carney and the City

As indicated above, Chapolini also asserts official capacity claims against Commissioner Carney and the City. An official capacity claim against an individual such as Commissioner Carney is indistinguishable from claims against the governmental entity that employs them, here, the City. *See Graham*, 473 U.S. at 165–66 ("Official-capacity suits . . . 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978))). "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Id.*

Based on the above, to plausibly assert a claim against Commissioner Carney in her official capacity, Chapolini must include sufficient allegations that would allow for liability against the City. *See Thomas v. City of Chester*, Civ. A. No. 15-3955, 2016 WL 1106900, at *2 (E.D. Pa. Mar. 21, 2016) ("A suit for damages against an individual municipal employee in his or her 'official capacity' is not cognizable unless the requirements of *Monell* are met." (citation omitted)); *see also McHugh v. Koons*, Civ. A. No. 14-7165, 2015 WL 9489593, at *9 (E.D. Pa. Dec. 30, 2015) ("An official capacity suit against a prosecutor is essentially a municipal liability claim against the District Attorney's Office[] pursuant to *Monell*."). To assert plausible claims against the City, Chapolini must allege that it has a policy or custom which caused the violation of his constitutional rights. *See Monell*, 436 U.S. at 694 ("We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government

as an entity is responsible under § 1983."). Thus, Chapolini "must identify [the] custom or policy, and specify what exactly that custom or policy was" to satisfy the applicable pleading standard. *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009) (citation omitted).

A "policy" arises when a decision-maker possessing final authority issues an official proclamation, policy, or edict. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986). "'Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'" *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)). For a custom to be the proximate cause of an injury, a plaintiff must establish that the defendant "had knowledge of similar unlawful conduct in the past, failed to take precautions against future violations, and that its failure, at least in part, led to [the plaintiff's] injury." *Id.* (internal quotation marks and alterations omitted). Regardless of whether a plaintiff is seeking to impose *Monell* liability for a policy or a custom, "it is incumbent upon a plaintiff to show that a policymaker is responsible either for the policy or, through acquiescence, for the custom." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990); *see also Bielevicz*, 915 F.2d at 850 (explaining that in both methods to obtain liability under *Monell*, "a plaintiff must show that an official who has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom").

In addition,

[t]here are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." *Bryan County*, 520 U.S. at 417, 117 S.Ct. 1382 (Souter, J., dissenting). The

second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." *Id.* Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice is likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 417–18, 117 S.Ct. 1382 (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see also Berg*, 219 F.3d at 276 (holding that plaintiff must "demonstrat[e] that the municipal action was taken with 'deliberate indifference' to its known or obvious consequences").

*Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003) (alterations in original) (internal footnote omitted).

In this case, Chapolini does not allege that the conditions of which he complains were the result of a policy or custom of the City. Instead, Chapolini complains generally about prison conditions instituted in the effort to contain the spread of COVID-19 and his own experience of being denied showers, telephone calls, use of the law library, access to the commissary, exercise, and in-person visits with family members and friends. Accordingly, Chapolini fails to state a plausible *Monell*/official capacity claims against the City of Philadelphia and Commissioner Carney. The court will dismiss these claims, but because the court cannot say that Chapolini could never assert a plausible claim, this dismissal will be without prejudice to Chapolini having the opportunity to file an amended complaint to the extent he can assert a plausible *Monell* claim.[10]

### 3.     Individual Capacity Claims Against Commissioner Carney

Chapolini asserts that the conditions of his confinement as a pretrial detainee, including the lockdown measures Commissioner Carney instituted to respond to COVID-19, amounted to

---

[10] A district court should generally provide a *pro se* plaintiff with leave to amend unless amending would be inequitable or futile. *See Grayson v. Mayview St. Hosp.*, 293 F.3d 103, 114 (3d Cir. 2002) (stating general rule). Also, "in civil rights cases district courts must offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 252 (3d Cir. 2007).

unconstitutional punishment. Although Chapolini alleges violations of his First, Fifth, Eighth, and Fourteenth Amendment rights, *see* Compl. at ECF p. 17, the court understands the complaint as attempting to present claims against Commissioner Carney for the denial of his First Amendment right to access the courts and for the denial of his Fourteenth Amendment right to due process as it relates to the conditions of his confinement. With this understanding, Chapolini has not asserted a plausible section 1983 claim against Commissioner Carney.

a.    Denial of Access to the Courts

Incarcerated individuals have a constitutional right to "adequate, effective, and meaningful" access to the courts. *Bounds v. Smith*, 430 U.S. 817, 822 (1977). To prevail on an alleged denial of access to the courts claim, a plaintiff "is required to show that the denial of access caused actual injury." *Jackson v. Whalen*, 568 F. App'x 85, 87 (3d Cir. 2014) (per curiam) (quoting *Lewis v. Casey*, 518 U.S. 343, 350 (1996)). In other words, a prisoner claiming that a defendant denied him access to the courts must allege an injury traceable to the conditions of which the prisoner complains. *See Diaz v. Holder*, 532 F. App'x 61, 63 (3d Cir. 2013) (per curiam) (affirming district court's dismissal of *pro se* prisoner's denial of access to courts claims where prisoner failed to tie alleged deficiencies in library to harm in underlying action); *Williams v. Price*, 25 F. Supp. 2d 605, 616 (W.D. Pa. 1997) (explaining that plaintiff seeking to assert denial of access to courts claim must "show actual injury to a specific legal claim which sought to vindicate 'basic constitutional rights'" (quoting *Lewis*, 518 U.S. at 354)). In general, an actual injury occurs when a prisoner demonstrates that the prisoner lost a "nonfrivolous" and "arguable" claim because a defendant denied the prisoner access to the courts. *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). Thus, "[t]he underlying cause of action, . . . is an element that must be described in the complaint." *Id.* Furthermore, the right to access the courts may be satisfied if the plaintiff has an

attorney. *See Diaz*, 532 F. App'x at 63 ("The right [of access to the courts] can be satisfied . . . by appointing Diaz an attorney." (citing *Peterkin v. Jeffes*, 855 F.2d 1021, 1042 (3d Cir. 1988) and *Degrate v. Godwin*, 84 F.3d 768, 768–69 (5th Cir. 1996))); *see also Prater v. City of Philadelphia*, 542 F. App'x 135, 137 n.4 (3d Cir. 2013) (per curiam) ("We also agree that Prater's inability to access the library as much as he would have liked does not state an access-to-courts claim because appointment of counsel is sufficient to provide a pretrial detainee with 'meaningful access to courts.'" (citations omitted)).

Even if Chapolini had adequately pleaded an actual injury for his lack of access to the court, which he has not, the court would nevertheless dismiss his denial of access to the courts claim because the public dockets for his pending criminal cases reveal that he is represented by the Defender Association of Philadelphia in each case. *See supra* at 7, n.7 (listing pending criminal cases).[11] Chapolini cannot state a plausible claim for denial of access to courts if he is represented by counsel in his criminal cases, including prior to and during the preliminary hearing. *See Prater*, 542 F. App'x at 137 n.4 ("We also agree that Prater's inability to access the library as much as he would have liked does not state an access-to-courts claim because appointment of counsel is sufficient to provide a pretrial detainee with meaningful access to courts." (citation and internal quotation marks omitted)); *see also Diaz*, 532 F. App'x at 63 ("[A]n adequate prison law library is but one of many acceptable ways to satisfy Diaz's right to access the courts. And, as Diaz himself admitted, he did have appointed counsel for his direct appeal and may have the benefit of counsel

---

[11] Although the court referenced the dockets for Chapolini's criminal cases in the Court of Common Pleas, the court recognizes that Chapolini complains about his inability to properly prepare for his preliminary hearing, which would have occurred in the Municipal Court of Philadelphia County. Nonetheless, the Defender Association of Philadelphia appears to have been representing Chapolini at the time of his preliminary hearing. *See, e.g.*, Docket, *Commonwealth v. Chapolini*, No. MC-51-CR-1056-2020 (Philadelphia Mun. Ct.), *available at*: https://ujsportal.pacourts.us/Report/CpDocketSheet?docketNumber=MC-51-CR-0001056-2020&dnh=tbt1OHcAcPhZixZukzISNw%3D%3D (showing that preliminary hearing was held on March 9, 2021, charges were bound over to Court of Common Pleas, and Defender Association of Philadelphia represented Chapolini during hearing).

in future filings." (internal citations omitted)); *Falzerano v. Collier*, 535 F. Supp. 800, 803 (D.N.J. 1982) (concluding that pretrial detainee's inability to access law library was not constitutional violation where he had public defender services available to assist in his criminal defense); *Roman v. Union Cty. Jail*, Civ. A. No. 16-1049 (ES), 2017 WL 498715, at *5 (D.N.J. Feb. 7, 2017) (dismissing pretrial detainee's access-to-courts claim because, *inter alia*, he was represented by counsel during his criminal proceedings and "appointment of counsel is sufficient to provide a pretrial detainee with meaningful access to courts" (quoting *Prater*, 542 F. App'x at 137 n.4)); *Hurdle v. Dantos*, Civ. A. No. 20-CV-5595, 2020 WL 6747293, at *6 (E.D. Pa. Nov. 17, 2020) (denying pretrial detainee's access-to-courts claim in nature of lack of access to legal research in part because counsel represented pretrial detainee ).

Because Chapolini was represented by counsel in his underlying criminal proceedings, he has failed to state a plausible claim for a denial of access to the courts. The court will dismiss this claim without prejudice to Chapolini asserting the claim in an amended complaint if he can plausibly allege how his alleged inability to access the prison law library has caused a constitutional injury.

b.    Lockdown Measures in Response to COVID-19

Chapolini alleges that he was subjected to punitive conditions at CFCF and PICC when, in response to the COVID-19 pandemic, Commissioner Carney imposed restrictions confining inmates and pretrial detainees to their cells for over 23 ½ hours a day, denying them in-person visitation and out-of-cell exercise, restricting their ability to make telephone calls, take showers, or purchase necessary items from the commissary. As discussed below, Chapolini has failed to state a plausible claim for a constitutional violation against Commissioner Carney.

To establish a constitutional violation under the Fourteenth Amendment, a pretrial detainee plaintiff would have to plausibly allege that the challenged conditions of confinement amount to punishment. *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979) ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee."); *see also Bistrian v. Levi*, 696 F.3d 352, 373 (3d Cir. 2012) ("Given pretrial detainees' federally protected liberty interests . . . under the Due Process Clause . . . a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law." (citation and internal quotation marks omitted)). When analyzing whether a condition of confinement amounts to punishment, the inquiry generally turns on whether the challenged conditions have a purpose other than punishment and whether the conditions are excessive in relation to that purpose. *See Bell*, 441 U.S. at 538–39 ("A court must decide whether the [particular restriction or condition accompanying pretrial detention] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."); *Hope v. Warden York Cty. Prison*, 972 F.3d 310, 326 (3d Cir. 2020) (explaining that, when evaluating claims of punitive conditions of confinement, "[t]he touchstone for the constitutionality of detention is whether conditions of confinement are meant to punish or are 'but an incident of some other legitimate governmental purpose.'" (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008) ("*Hubbard II*"))); *Hubbard v. Taylor*, 399 F.3d 150, 158 (3d Cir. 2005) (discussing analysis of whether condition of confinement constitutes punishment for Fourteenth Amendment purposes).[12] In addition, the court should consider the totality of the circumstances in assessing

---

[12] The *Bell* Court also explained:

> Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the restriction] may

whether a prisoner's conditions of confinement violate the Fourteenth Amendment. *See Hubbard II*, 538 F.3d at 236, 238 (examining totality of circumstances to determine whether conditions of confinement constitute Fourteenth Amendment violation); *Nami v. Fauver*, 82 F.3d 63, 67 (3d Cir. 1996) (explaining that "to determine whether conditions of confinement violate the Eighth Amendment, it is necessary to examine the totality of the conditions at the institution"); *Union Cty. Jail Inmates v. DiBuono*, 713 F.2d 984, 1000–01 (3d Cir. 1983) (discussing that "the overall length of confinement is only one factor among several that must be considered by a district court in evaluating the totality of circumstances relevant to any alleged constitutional deficiency in shelter").

"Unconstitutional punishment typically includes both objective and subjective components." *Stevenson v. Carroll*, 495 F.3d 62, 68 (3d Cir. 2007). "[T]he objective component requires an inquiry into whether the deprivation was sufficiently serious and the subjective component whether the officials acted with a sufficiently culpable state of mind." *Id.* (internal quotation marks and alterations omitted). In general, when alleging a sufficiently culpable state of mind, a detainee must assert that prison officials acted with deliberate indifference, meaning that they consciously disregarded a serious risk to the detainee's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 298–99 (1991); *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."); *cf. Edwards v. Northampton Cty.*, 663 F. App'x 132, 135 (3d

---

rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to punishment. Conversely, if a restriction or condition is not reasonably related to a legitimate goal- if it is arbitrary or purposeless-a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

441 U.S. at 538–39 (internal quotation marks, citations, and footnote omitted).

Cir. 2016) (per curiam) ("[W]e agree with the District Court and find no reason to apply a different standard here as we have applied the 'deliberate indifference' standard both in cases involving prisoners, and pretrial detainees[.]" (internal citations omitted)).

> Furthermore,
>
> [i]n determining whether restrictions or conditions are reasonably related to the Government's interest in maintaining security and order and operating the institution in a manageable fashion, courts must heed our warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters."

*Bell*, 441 U.S. at 541 n.23 (quoting *Pell v. Procunier*, 417 U.S. 817, 827 (1974)); *see also Steele v. Cicchi*, 855 F.3d 494, 505 (3d Cir. 2017) ("The Supreme Court repeatedly has emphasized that maintaining internal security and order in jails and prisons are 'legitimate governmental objectives' and that courts must give prison officials considerable discretion to manage internal security in their institutions." (citations omitted)). The deference to prison officials' judgment is especially strong in the context of an "unprecedented" situation like COVID-19, where "responsive measures [were] specifically implemented to detect and to prevent spread of the virus." *Hope*, 972 F.3d at 327 (concluding that conditions of confinement during COVID-19 did not amount to unconstitutional punishment); *McClain v. United States*, Civ. A. No. 21-4997 (SDW), 2021 WL 4820629, at *3–4 (D.N.J. Oct. 15, 2021) (dismissing without prejudice conditions-of-confinement claim by pretrial detainee where "restrictions confining prisoners to their cells for the majority of their days and denying in person family visits during COVID-19-related lockdowns" were "rationally related to a legitimate purpose – controlling the threat of COVID-19").

Chapolini alleges that Commissioner Carney "exaggerate[ed] her . . . response to the precautions of the pandemic" by instituting lockdown measures that were excessive and punitive. *See* Compl. at ECF p. 17. He alleges that "for months" he was confined to his cell for 23 hours and 40 minutes each day and that he was forced to choose between a shower or a telephone call during the remaining 20 minutes he had out of his cell. Chapolini also alleges that he was unfairly deprived of his ability to exercise and visit in-person with friends and family. He also claims that he was prevented from purchasing commissary items or other essentials for some time. He further claims that he suffers from diabetes due to the inadequate time he had to exercise outside of his cell.

Despite these general allegations, without additional details about the lockdown measures, the court cannot assess the objective and subjective components of the alleged punishment. For instance, Chapolini has not alleged any facts about the defendants' stated reasons for imposing the lockdowns, except generally that they were in response to COVID-19. Chapolini has also not alleged any specifics about the size of his living space, the extent to which inmates were permitted to move about the prison (if at all) during the lockdown periods, the extent to which recreation or other activities were permitted, or any other circumstances to clarify the conditions in which he was held in connection with the lockdowns at issue. He also fails to allege how long he was subjected to the challenged conditions or describe the context in which the lockdowns occurred.

Although Chapolini complains generally that there were "countless" lockdowns and 14-days quarantines, he does not allege how often they occurred or the specific deprivations he suffered during them. He states that the conditions improved "at some point" as a result of *Remick*, but he does not explain how or when the conditions improved. Also, Chapolini generally describes the lockdowns as lasting 23 hours and 40 minutes a day, he has not alleged sufficient facts about the duration of those conditions such that the court could conclude that they were objectively

serious. *See Stokes v. Carney*, Civ. A. No. 21-CV-1435, 2021 WL 4477185, at \*8 (E.D. Pa. Sept. 29, 2021) (concluding that plaintiffs failed to state claim based on conditions of confinement where they "have not alleged sufficient facts about the extent, duration, and effect of those conditions from which this Court could infer that the challenged conditions were objectively serious, such that inmates housed on A-1-3 were deprived of a basic human need or that their health or safety was at risk"). Similarly, without sufficient facts about what the lockdowns entailed or why the conditions were excessive under the circumstances, Chapolini also fails to allege plausibly that Carney acted with a sufficiently culpable state of mind, *i.e.* an express intent to punish. *See Bell*, 441 U.S. at 538–39; *see also Bistrian*, 696 F.3d at 373.

At bottom, Chapolini's allegations are insufficient at this time to assert a plausible claim that the lockdown measures ordered by Commissioner Carney constituted punishment under the Fourteenth Amendment. As such, the court will dismiss this claim without prejudice to Chapolini reasserting the claim in an amended complaint if he can cure the deficiencies identified by the court.[13]

c.   Unsanitary Conditions of Confinement at CFCF and PICC

In addition to his complaints about the lockdowns imposed in response to COVID-19, Chapolini also complains generally that Commissioner Carney permitted unsanitary conditions at CFCF and PICC. As with the complaints about the lockdowns, complaints about unsanitary

---

[13] Chapolini also requests a preliminary and permanent injunction, "ordering . . . Commissioner Blanche Carney to allow [him] his entitled out of cell time, exercise time, access to the facilities [sic] law library, proper sanitary overall housing conditions, and access to proper visitation." Compl. at ECF p. 18. A plaintiff seeking a preliminary injunction "must demonstrate, first, a likelihood of success on the merits, and second, that 'it is more likely than not to suffer irreparable harm in the absence of preliminary relief.'" *Mallet and Co. Inc. v. Lacayo*, 16 F.4th 364, 380 (3d Cir. 2021) (quoting *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)). "If both factors are established[,] . . . the district court considers the two remaining factors – whether granting relief will result in even greater harm to the nonmoving party or other interested persons and whether the public interest favors such relief." *Id.*

Here, for the reasons set forth above, Chapolini cannot establish that he is likely to succeed on the merits of his section 1983 claims against Commissioner Carney. Accordingly, the court will deny any request for an injunction at this time.

conditions of confinement by pretrial detainees are governed by the Due Process Clause of the Fourteenth Amendment. *See Hubbard*, 399 F.3d at 166. Thus, to state a claim, Chapolini must also allege the conditions of confinement amounted to punishment. *See Bell*, 441 U.S. at 538.

After reviewing Chapolini's allegations, the court finds that he has failed to state a plausible due process claim for unsanitary conditions of confinement in multiple respects. In the first instance, Chapolini fails to allege the requisite personal involvement of Commissioner Carney to establish a basis for liability under section 1983. *See Rode*, 845 F.2d at 1207; *Dooley v. Wetzel*, 957 F.3d at 374 ("Personal involvement requires particular 'allegations of personal direction or of actual knowledge and acquiescence.'" (quoting *Rode*, 845 F.2d at 1207)). His general and vague allegation that Commissioner Carney did "not properly improv[e]" the "unsanitary housing conditions" is insufficient.

Additionally, Chapolini fails to provide sufficient factual details about the unsanitary conditions themselves. The court recognizes that Chapolini does generally allege that he was not provided with clean sheets or cleaning supplies at CFCF. He also alleges that, while at PICC, there were "countless mice and roaches scampering around," "wild undomesticated city birds flying around and dropping fecal matter," and smoky conditions making it difficult to breathe. *See* Compl. at ECF p. 13. Nonetheless, Chapolini does not provide any details about these unsanitary conditions, such as how long he went without clean sheets or cleaning supplies, and the length and extent of his exposure to mice, cockroaches, birds, and smoky conditions at the PICC. Without these details, Chapolini has failed to state a plausible claim because certain unsanitary conditions, while uncomfortable or unpleasant, may not rise to the level of sufficiently serious or punitive in nature to state a plausible claim. *See Thomas v. SCI-Graterford*, Civ. A. No. 11-6799, 2014 WL 550555, at *4, 5 (E.D. Pa. Feb. 12, 2014) (concluding that (1) while presence of insects in prison

was uncomfortable, plaintiff had not "demonstrated an unconstitutional threat to his health and safety" and (2) denial of cleaning supplies for two-week period was insufficiently serious to satisfy objective component of conditions-of-confinement claim). Thus, the court is unable to assess whether the alleged unsanitary conditions were sufficiently serious to constitute a cognizable claim.

Finally, Chapolini's claim is implausible as pleaded because he has not alleged how he was harmed by the alleged unsanitary conditions. *See Fortune v. Hamberger*, 379 F. App'x 116, 122 (3d Cir. 2010) (per curiam) (concluding that denial for showers for 15 days did not violate Eighth Amendment when inmate did not "suffer[] any harm as a result of the denial of additional showers"); *Lindsey v. Shaffer*, 411 F. App'x 466, 468 (3d Cir. 2011) (per curiam) (concluding that whether plaintiff suffered harm was critical to determination of whether unsanitary conditions were unconstitutional). Accordingly, the court will also dismiss without prejudice Chapolini's claims based on the unsanitary conditions of his confinement at CFCF and PICC.

### 4. Failure to Protect Against COVID-19

Liberally construing the complaint, the court understands Chapolini to be asserting a claim that prison officials failed to adequately protect him from COVID-19 exposure, which resulted in him contracting the virus. To state a plausible claim for failure to protect in the context of COVID-19, Chapolini must allege facts to support a plausible inference that the defendants confined him in conditions that amounted to punishment or that the defendants were deliberately indifferent to his serious medical needs (*i.e.*, his particular "vulnerability to COVID-19"). *See Hope*, 972 F.3d at 325 (holding that there are two ways for pretrial detainee to state claim for denial of substantive due process as it relates to COVID-19 exposure). To meet this standard, the facts alleged must reflect either: (1) that the challenged conditions were imposed "for the express purpose of

28

punishment, and if not, whether they are rationally connected to a legitimate purpose but excessive in relation to its purpose," *id.* at 328; or (2) that the "Government knew of *and disregarded* an excessive risk to their health and safety." *Id.* at 329 (citing *Nicini v. Morra*, 212 F.3d 798, 811 (3d Cir. 2000)).

"The context of the Government's conduct is essential to determine whether it shows the requisite deliberate indifference," and, in evaluating this context, courts must defer to the expertise of both medical officials and jail administrators, and not assume a constitutional defect where concrete action has been taken as constitutional rules "are not subject to mechanical application *in unfamiliar territory*." *Id.* at 330 (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)). Thus, where a detention facility has taken concrete steps toward mitigating the medical effects of COVID-19, an incarcerated person will fall "well short" of establishing that the facility and its staff were deliberately indifferent toward his medical needs in light of the virus even though they cannot entirely "eliminate all risk" of contracting COVID-19, notwithstanding even serious preexisting medical conditions the prisoner may have. *See id.* at 330–31.

As indicated above, Chapolini alleges that between March 2020 and May 2020, he had multiple cellmates that came through the CFCF intake unit without first undergoing proper quarantine. *See* Compl. at ECF p. 10. He complained about this to "institutional staff" but "nothing changed." *Id.* He further alleges that he and 25 other inmates in his unit contracted COVID-19 in July 2020, after an inmate who visited the hospital returned to his unit without first undergoing proper quarantine protocols. *See id.*

These allegations are insufficient to allege a plausible claim that prison officials failed to adequately protect him from exposure to COVID-19. He has not alleged that any conditions were imposed for the express purpose of punishment or that the conditions were excessive in relation to

their legitimate purpose of managing the spread of the virus. Chapolini also does not sufficiently allege that prison officials at CFCF knew of and disregarded an excessive risk to his health and safety. Instead, he only states that he contracted COVID-19 and that he likely got it because quarantine protocols at CFCF were either inadequate or improperly followed. This is also inadequate to state a plausible claim because his COVID-19 diagnosis alone is an insufficient basis upon which to establish a constitutional violation. *See Hope*, 972 F.3d at 330 (explaining that Constitution does not require government to entirely eliminate risk of contracting COVID-19 in correctional setting, stating "[plaintiffs] argue that the Government must eliminate *entirely* their risk of contracting COVID-19. That task is not the constitutional standard, however"). Moreover, even if quarantine protocols were inadequate and improperly followed, these allegations show negligence on the part of CFCF, which is not the requisite constitutional standard. *See id.* at 329 ("Deliberate indifference requires significantly more than negligence.").

In addition, even if Chapolini were to have included allegations in the complaint which give rise to an inference of deliberate indifference, he has again failed to allege the requisite personal involvement of any defendant to establish a basis for liability under section 1983. *See Rode*, 845 F.2d at 1207; *Dooley*, 957 F.3d at 374. Chapolini does not tie the alleged constitutional violation to any individual, but merely references unnamed "institutional staff" to which he complained. To the extent Chapolini asserts this claim against Commissioner Carney as a high-level prison official, the claim is implausible because it does not allege her personal involvement, whether on an individual or supervisory level.[14] *See Saisi v. Murray*, 822 F. App'x 47, 48 (3d Cir.

---

[14] If a plaintiff seeks to hold a supervisor liable for the unconstitutional acts by subordinates, there are two theories of supervisory liability: (1) "Individual defendants who are policymakers may be liable under § 1983 if it is shown that such defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm[;]" and (2) "[A] supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juv. Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (citation omitted).

2020) (per curiam) ("Saisi asserted that some defendants were in charge of agencies that allowed this to happen, and that liability stemmed merely from defendants' 'belief' that their conduct would be 'tolerated.' However, a director cannot be held liable 'simply because of his position as the head of the [agency].'" (quoting *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005)).

For these reasons, Chapolini's claims for unconstitutional punishment and deliberate indifference to his serious medical needs based on the fact that he contracted COVID-19 are implausible. Therefore, the court will dismiss the claims without prejudice to Chapolini reasserting them in an amended complaint.

### 5. Denial of Medical Treatment Claim – COVID-19

While unclear, it appears that Chapolini may be attempting to assert a claim for the failure to provide medical treatment related to his COVID-19 sickness. In this regard, Chapolini alleges that he "made many complaints to the medical and/or correctional staff" after experiencing "the absolute worst cold symptoms" from COVID-19, and that his complaints were "blatantly ignored." Compl. at ECF p. 11. These allegations are insufficient to state a plausible constitutional claim for the failure to provide medical treatment because Chapolini must allege facts indicating that prison officials were deliberately indifferent to his serious medical needs. *See Farmer*, 511 U.S. at 835. Thus, he must allege that "the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197. Chapolini has not included any such allegations in the complaint.

In addition, Chapolini has not tied any of his allegations to any defendant. Instead, he states generally that medical and/or correctional staff refused the complaints but does not allege any

specific individuals involved with the refusals.[15] Accordingly, the court will dismiss this claim without prejudice to Chapolini including the claim in an amended complaint if he can cure the deficiencies noted in this opinion.

### 6.       Claims for Declaratory Relief

In the complaint, Chapolini seeks a declaration "that the acts and omissions described herein violated [his] rights." Compl. at ECF p. 18. This type of requested declaratory relief is improper because "[d]eclaratory judgment is inappropriate solely to adjudicate past conduct," and is also not "meant simply to proclaim that one party is liable to another." *Corliss v. O'Brien*, 200 F. App'x 80, 84 (3d Cir. 2006) (per curiam); *see also Taggart v. Saltz*, 855 F. App'x 812, 815 (3d Cir. 2021) (per curiam) ("A declaratory judgment is available to define the legal rights of parties, not to adjudicate past conduct where there is no threat of continuing harm." (citing *Waller v. Hanlon*, 922 F.3d 590, 603 (5th Cir. 2019)). Because Chapolini's request for a declaration only seeks to adjudicate past conduct, the court will dismiss his request for declaratory relief.

### III.       CONCLUSION

For the foregoing reasons, the court will grant Chapolini leave to proceed *in forma pauperis* and dismiss his complaint in part with prejudice and in part without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) for failure to state a claim. The court will dismiss with prejudice all official capacity claims against Nurse Keiady and Dr. Wilbraham. The court will dismiss without prejudice (1) all claims against the City and Commissioner Carney, (2) the claim for failure to protect against COVID-19, and (3) the denial of medical care claim as it relates to COVID-19. Chapolini's individual capacity claims against Nurse Keiady and Dr. Wilbraham pass statutory screening.

---

[15] If Chapolini wishes to name individuals for whom he does not have any identifying information, he may refer to those individuals as John Doe #1, John Doe #2, etc.

Because the court cannot say at this time that Chapolini cannot cure the defects in the claims that the court will dismiss without prejudice, the court will grant him the option of filing an amended complaint to attempt to cure the defects in those claims or advise the court that he seeks to proceed only on the individual capacity claims against Nurse Keiady and Dr. Wilbraham.

The court will enter a separate order.

BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.